**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ROBERT MICHAELSON OF ADVISORY
TRUST GROUP, LLC, IN HIS CAPACITY
AS DEBTOR REPRESENTATIVE AND
LIQUIDATING TRUSTEE,

       Plaintiff,

                                         Case No. 1:20-cv-01465-MN

v.

PETER BARONOFF, KEITH REUBEN,
BRIAN DUNN, DAVID ARMSTRONG,
JAMES HOPWOOD, RICHARD GOLD,
BRYAN DAY, STAN GRABISH, RICHARD
COHEN, STEVEN HELLAND, MALINDA
BARONOFF, SHANNA BARONOFF, and
JOHN DOES 1-100,

       Defendants.

**OPENING BRIEF IN SUPPORT OF THE BARONOFF DEFENDANTS'
<u>MOTION TO TRANSFER VENUE OR, ALTERNATIVELY, TO DISMISS</u>**

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 N. Market St., Suite 420
Wilmington, Delaware  19801

and

Benjamin H. Brodsky, Esq., FBN 73748
Corey D. Berkin, Esq., FBN 119069
(*pro hac vice* applications pending)
BRODSKY FOTIU-WOJTOWICZ, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131

Date:  February 19, 2021             *Counsel for the Baronoff Defendants*

## TABLE OF CONTENTS

**Page**

Table of Authorities ....................................................................................................... ii

Nature and Stage of proceedings ....................................................................................1

Summary of Grounds for Transfer or Dismissal..............................................................1

Factual and Procedural Background ................................................................................3

    A.  In All Material Respects, This Case Centers Around South Florida ............................3

    B.  The Stable-Value Fund Receivership Cripples the Companies .....................................6

    C.  In Settlement of the Litigation, the Baronoffs Surrendered Their Significant Holdings in the Companies in Exchange for Nominal Compensation, and the Stable-Value Fund Investors Nearly Unanimously Accepted the Deal .......................................................8

    D.  At the Receiver's Urging, Peter Stayed on as CEO of the Companies and Lead Them to Remarkable Profitability Out of the Collapse of Stable-Value Fund .....................10

    E.  Upon Peter's Resignation, the Companies Released Him and Agreed to Litigate Claims Relating to his Employment in the Southern District of Florida .................................12

Argument .....................................................................................................................13

I.    Venue Should be Transferred to the Southern District of Florida ....................................13

    A.  The Private Interest Factors Weigh in Favor of Transfer to the Southern District of Florida ...........................................................................................................14

        1.  There is an enforceable forum selection clause governing Plaintiff's claims against the Baronoffs and the Court should therefore deem the private interest factors to weigh entirely in favor of transfer .......................................................................14

        2.  The private interest factors favor transfer even absent the forum selection clause in the Separation Agreement....................................................................................19

    B.  The Public Interest Factors Also Weigh in Favor of Transfer....................................21

II.    Alternatively, the Court Should Dismiss Counts XII and XV (Malinda Fraudulent Transfer Claims) and Count V (Breach of Contract Claim)..........................................................22

    A.  Counts XII and XV Should Be Dismissed on Collateral Estoppel Grounds ..............22

i

B.  Count V Should be Dismissed for Failure to State a Claim ........................................24

III.    Conclusion ..........................................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page**

*Atlantic Marine Construction Co. v. U.S. District Court*, 571 U.S. 49 (2013) .............................14

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*,
    372 F.3d 154 (3d Cir. 2004)..................................................................................16

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983) .....................17

*Genuine Enabling Tech., LLC v. Nintendo Co.*, 369 F. Supp. 3d 590 (D. Del. 2019)....................4

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir.1989).........15

*In re Access Care, Inc.*, 333 B.R. 706 (Bankr. E.D. Pa. 2005).......................................................16

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .................................6-7

*In re Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239 (5th Cir. 1979) ................................17

*In re Diaz Contracting, Inc.*, 817 F.2d 1047 (3d Cir. 1987)..........................................................17

*In re Exide Techn.*, 544 F.3d 196 (3d Cir. 2008) .....................................................................16, 18

*In re Howmedica Osteonics Corp.*, 867 F.3d 390 (3d Cir. 2017)...............................................14, 18

*In re LMI Legacy Holdings, Inc.*, 553 B.R. 235 (Bankr. D. Del. 2016) ........................................15

*In re OMNA Med. Partners, Inc.*, No. 00-1493 (MFW),
    2000 WL 33712302 (Bankr. D. Del. June 12, 2000 ......................................................17

*In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993) ................................................................18

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d. Cir.1995)...............................................13, 14, 19

*Kurz v. EMAK Worldwide, Inc.*, 464 B.R. 635 (D. Del. 2011) ......................................................16

*M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1 (1972) ............................................................16

*Matter of McMillan*, 579 F.2d 289 (3d Cir. 1978)........................................................................23

*Montana v. United States*, 440 U.S. 147 (1979) ...........................................................................23

*OCB Rest. Co., LLC v. Vlahkais (In re Buffets Holdings, Inc.)*,
    397 B.R. 725 (Bankr. D. Del 2008) .................................................................................13

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993) ...............6

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
      181 F.3d 410 (3d Cir. 1999)...............................................................................7

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ............................................................7

*Shandler v. DLJ Merch. Banking, Inc. (In re Insilco Techs., Inc.)*,
      330 B.R. 512 (Bankr. D. Del. 2005) ....................................................................17

*Szehinskyj v. Attorney Gen. of the United States*, 432 F.3d 253 (3d Cir. 2005) ...........................23

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ....................................................23

## Statutes

28 U.S.C.§1409(a) ...........................................................................................1, 13

28 U.S.C.§1412................................................................................................1, 13

## Other References

Collier on Bankruptcy, ¶ 323.02[4] .........................................................................15

Defendants Peter Baronoff ("Peter"), Malinda Baronoff ("Malinda"), and Shanna Baronoff ("Shanna") (together, the "Baronoff Defendants"), by and through undersigned counsel, move the Court to transfer venue of this action to the Southern District of Florida pursuant to 28 U.S.C. § 1404 and 28 U.S.C. § 1412, or, alternatively to dismiss the Complaint filed by Plaintiff Robert Michaelson of Advisory Trust Group, LLC, in His Capacity as Debtor Representative and Liquidating Trustee ("Plaintiff"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## NATURE AND STAGE OF PROCEEDINGS.

1. Plaintiff filed the complaint initiating this civil action on October 28, 2020. The Baronoff Defendants' deadline to respond to the Complaint is February 19, 2021. The Baronoff Defendants filed a Motion to Transfer Venue or, Alternatively, to Dismiss (the "Motion") in lieu of filing answers to the complaint. This is the Baronoff Defendants' opening brief in support of the Motion.

## SUMMARY OF GROUNDS FOR TRANSFER OR DISMISSAL

2. Plaintiff's Complaint is a remarkable rewriting of history that casts Peter as the villain in the Promise Healthcare saga, when, in fact, he is the primary reason why the company survived and even thrived during his tenure as the CEO. This is not a matter of reasonable dispute, as is demonstrated by the historical record of transactional documents and court records that Plaintiff selectively and misleadingly cites in his Complaint. Indeed, Peter is one of the original collateral victims of the Stable-Value Fund receivership—as it resulted in the loss of critical funding to his companies, Promise Healthcare Inc. and Success Healthcare, LLC—yet he doggedly and skillfully led the companies for the length of his tenure to the benefit of shareholders and creditors. And he did so long after he surrendered his shares for a fraction of their worth in order to save what had been his life's work to that point in time. Plaintiff's efforts to claw back the

1

modest consideration the Baronoffs received for those shares, to ignore the companies' success against the odds because of Peter's work, and to blame Peter for losses that occurred after he separated from the companies will be exposed as the cynical money grab that they are at the appropriate time and in the appropriate venue.

3.      As set forth in this Motion, the appropriate venue for those factual determinations is the Southern District of Florida.  This is so because, in all material respects, this case centers around South Florida. It involves health care businesses based in South Florida that were run by people who live or lived in South Florida and were engaged in transactions occurring in South Florida that are governed by contracts siting the Southern District of Florida as the exclusive dispute resolution venue.  Half of the defendants live in South Florida, as do the majority of material witnesses, including the receiver of the Stable-Value Fund.  And there is no legitimate reason to keep the case in this District, as the bankruptcy court has already confirmed the Second Amended Joint Plan of Liquidation for the Companies, and all that is left is for Plaintiff to pursue potential sources of recovery for the debtors' estate.  A district court in the Southern District of Florida would be no less capable or efficient than this Court at adjudicating Plaintiff's claims and thereby benefitting the estate.  In fact, it would be cheaper and more efficient for the debtors' estates for Plaintiff's claims to be prosecuted in South Florida.  For these reasons and others, the case should be transferred.

4.      Finally, in the event the Court decides to keep venue in this District, the Baronoffs request that the Court dismiss Counts XII and XV (fraudulent transfer claims against Malinda) on collateral estoppel grounds, and Count V (a breach of employment agreement against Peter) for failure to state a claim.  As to the fraudulent transfer claims, a federal district court has already determined that the bargained for exchange that resulted in the payments to Malinda was fair,

adequate, and reasonable.  These findings are binding on Plaintiff.  And as to the breach of contract claim against Peter, it fails as the conduct complained of—that he served on the board of another company in which Promise had invested—was plainly allowed under his employment agreement and disclosed to and approved by the board of the Companies.   Until this Motion is decided, the Baronoffs request that the Court extend the deadline for them to answer and assert any counterclaims to the Complaint.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.  In All Material Respects, This Case Centers Around South Florida.**

5.      This case is about health care businesses based in South Florida that were run by people who live or lived in South Florida.  The transactions with which Plaintiff takes issue occurred in South Florida and are governed by contracts with forum selection clauses siting venue for disputes in South Florida.

6.      The Companies are and were South Florida-based. Promise Healthcare, Inc. ("Promise") is a Florida corporation with its principal place of business in Miami, Florida. (*See* Detail by Entity Name, Promise Healthcare, Inc., Florida Division of Corporations, www.sunbiz.org, attached to the Appendix as Exhibit A (pp. A1-A4).)  Success Healthcare, LLC ("Success") is a California limited liability company with its principal place of business in Miami, Florida. (*See* Detail by Entity Name, Success Healthcare, LLC, Florida Division of Corporations, www.sunbiz.org, attached to the Appendix as Exhibit B (pp. A5-A8).)  At all times relevant to this lawsuit, the Companies had their offices and employed their employees in South Florida, conducted their daily business operations in South Florida, and held board meetings in South

3

Florida.   (Declaration of Peter Baronoff ("Baronoff Decl."), attached hereto as Exhibit A, ¶ 5.)[1]

       7.     The ancillary companies were also Florida-based.  Sun Capital, Inc. and Sun Capital Healthcare, Inc. (together, "Sun Capital") were both, prior to their dissolution in 2015, Florida corporations with their principal place of business in Palm Beach County, Florida. (*See*  Detail by Entity Name, Sun Capital, Inc., Florida Division of Corporations, www.sunbiz.org, attached to the Appendix as Exhibit C (pp. A9-A12); Detail by Entity Name, Sun Capital Healthcare, Inc., Florida Division of Corporations, www.sunbiz.org, attached to the Appendix as Exhibit D (pp. A13-A16).) Like the Companies, Sun Capital had their offices and employed their employees in South Florida, conducted their daily business operations in South Florida, and held board meetings in South Florida.   (Baronoff Decl. ¶ 7.)

       8.     Founding Partners Stable-Value Fund, LP ("Stable-Value Fund") is a Delaware limited partnership with its principal place of business in Miami, Florida.  (*See* Detail by Entity Name, Founding Partners Stable-Value Fund, LP, Florida Division of Corporations, www.sunbiz.org, attached to the Appendix as Exhibit E (pp. A17-A20).) The general partner of Founding Partners Stable-Value Fund, LP, Founding Partners Capital Management Company is a Florida corporation with its principal place of business in Miami, Florida.   (*See* Detail by Entity Name, Founding Partners Capital Management Company, Florida Division of Corporations, www.sunbiz.org, attached to the Appendix as Exhibit F (pp. A21-A24).)  The business transactions between Stable-Value Fund, Sun Capital, and the Companies all occurred in South Florida. (Baronoff Decl. ¶ 10.)

---

[1] On a motion to dismiss or transfer for improper venue, the Court may consider affidavits submitted by the parties. *Genuine Enabling Tech., LLC v. Nintendo Co.*, 369 F. Supp. 3d 590, 593 (D. Del. 2019).

9.     Half of the Defendants are South Florida-based.  Six defendants live in either Palm Beach County, Florida or neighboring Broward County, Florida: Malinda, Shanna, David Armstrong, Richard Gold, Stan Grabish, and Richard Cohen. (Compl. ¶¶ 39, 41, 47, 49, 53, 55.) On top of that, Malinda has significant health problems that make travelling to Delaware for any of these proceedings practically impossible. (Baronoff Decl. ¶ 12.)  Peter lived in Florida at nearly all times relevant to this suit and has never lived in Delaware. (Baronoff Decl. ¶ 13.) None of the remaining five defendants live in Delaware.  (Compl. ¶¶ 35, 37, 43, 45, 51.)

10.     The crucial witnesses in these cases who are not named as defendants include Howard Koslow and Lawrence Leder, the alleged recipients of millions of dollars of fraudulent transfers Plaintiff claims were improperly approved by Defendants.  Both Mr. Koslow and Mr. Leder live in South Florida.  (Baronoff Decl. ¶ 14.)  The longtime trustee of Stable Value, Dan Newman, perhaps the most important witness as to the events leading to the creation of Promise Healthcare Group, LLC ("PHG"), is a practicing lawyer in South Florida. (Baronoff Decl. ¶ 15.) Crowe Horwath's audit team for the Companies was based in Florida. (Baronoff Decl. ¶ 17.)  John Siedlecki, the responsible partner at FTI Consulting, the "turnaround" firm hired by PHG, has a home in South Florida.  (Baronoff Decl. ¶ 18.)  iCare, the electronic health records company in which the Companies invested, has at all relevant times been based in South Florida.  (Baronoff Decl. ¶ 19.) Aleyda Yanes, the Companies' controller, who will give key testimony on the Companies' accounting and financial information, still lives in South Florida, as does Maureen Moore, the Companies' former director of clinical operations, who will testify about the Companies' operations during Peter's tenure.  Finally, Dr. Chuck Posternack, Promise's Chief Medical Officer, COO, and President during 2017 and 2018, will provide critical testimony in support of Peter's defense—he, too, lives in South Florida. (Baronoff Decl. ¶¶ 21-23.)

5

11.     The relevant events in this case took place in South Florida.  The settlement of the Stable-Value Fund receiver's action that gave birth to PHG was negotiated and signed in South Florida. (Baronoff Decl. ¶ 16.)  The board decisions alleged in the Complaint took place in South Florida, as did the communications by and among officers, directors, and employees of the Companies. (Baronoff Decl. ¶ 24.)  The iCare transaction was negotiated and consummated in South Florida.  (Baronoff Decl. ¶ 20.)  The lease between Shanna and the Companies was signed in South Florida for a condominium unit in South Florida. (Baronoff Decl. ¶ 25.)  Peter's Separation Agreement and Mutual General Release was negotiated and executed in South Florida and contains a mandatory forum selection clause siting venue in the Southern District of Florida. (Baronoff Decl. ¶ 26.)  The lawyers who negotiated these agreements—for example Sarah Gold, Howard Weiss, and Henry Handler—are all located in South Florida.  (Baronoff Decl. ¶ 27.)

12.     In sum, the locus of all significant witnesses and events in this case is South Florida, while Delaware has no connection to the case other than being the state of formation of the holding company, PHG, and the state in which PHG, and Promise and Success as its subsidiaries, filed their bankruptcy petitions.

## B.  The Stable-Value Fund Receivership Cripples the Companies

13.     The following facts come from the Complaint, are from public records that are subject to judicial notice, or are from documents that are integral to and explicitly relied upon in the Complaint but not attached to the pleading.[2]   A complete recounting of the facts that will

---

[2] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). "However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.

6

exonerate the Baronoffs, including an accurate recitation of the events that followed the formation of PHG, will need to wait for a later stage of the case.

14.     Stable-Value Fund provided financing to Sun Capital.  (Compl. ¶¶ 70-77.)  Sun Capital in turn provided financing to its affiliated entities, Promise and Success (together, the "Companies").  Prior to the collapse of Stable-Value Fund, Peter and Malinda owned 33.3.% of Success, 28% of Promise, and 60% of Sun Capital.  (Compl. ¶¶ 72-73.)

15.     The Securities and Exchange Commission sued Stable-Value Fund in April 2009 in the Middle District of Florida, where it was then based, alleging that Stable Value misrepresented to its investors the nature of the financing it provided to Sun Capital.  (Compl. ¶¶ 78-79.)  The next month, Judge John E. Steele of the Middle District of Florida appointed a receiver over Stable-Value Fund.  (Compl. ¶ 84.)

16.     After the SEC filed suit, Stable-Value Fund ceased financing Sun Capital, which had a devastating impact on the business of Sun Capital and the Companies.  *Newman v. Sun Capital, Inc.*, No. 2:09-CV-445-FTM-29 (M.D. Fla. Aug. 24, 2009) (D.I. No. 29) attached to the Appendix as Exhibit G (pp. A25-A76).  Adding insult to injury, in June 2009, the receiver, on behalf of Stable-Value Fund, sued Sun Capital and related entities to recover $550 million in loans that were allegedly owed by Sun Capital to Stable-Value Fund. (Compl. ¶ 85.)

17.     In August 2009, Sun Capital countersued Stable-Value Fund and the receiver,

---

1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).  "[T]he justification for the integral documents exception is that it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." *Schmidt v. Skolas*, 770 F.3d 241, 250 (3d Cir. 2014) (citing *In re Burlington*, 114 F.3d at 1426).  Additionally, the Court may take judicial notice of pleadings and judicial opinions to see if they "contradict[] the complaint's legal conclusions or factual claims." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 427 (3d Cir. 1999).

alleging that Stable-Value Fund had anticipatorily breached its credit agreements with Sun Capital by declaring that it would no longer fund Sun Capital due to Stable-Value Fund's own financial mismanagement, and that the receiver further breached the credit agreements by improperly declaring Sun Capital in default.  *Newman v. Sun Capital, Inc.*, No. 2:09-CV-445-FTM-29 (M.D. Fla. Aug. 24, 2009) (D.I. No. 29).

> ### C. In Settlement of the Litigation, the Baronoffs Surrendered Their Significant Holdings in the Companies in Exchange for Nominal Compensation, and the <u>Stable-Value Fund Investors Nearly Unanimously Accepted the Deal.</u>

18.     After three-and-a-half years of litigation and settlement discussions, Sun Capital, its principals, the receiver, and the Stable-Value Fund investors entered into a Settlement Agreement on January 9, 2013 that became effective on March 17, 2014.  A copy of the Settlement Agreement is attached to the Appendix as Exhibit H (pp. A77-A329).  **Critically, the Settlement Agreement was approved by the presiding District Court Judge, Judge Steele, who found the bargained for exchange of consideration between the parties to be <u>fair, reasonable, adequate, and free from collusion between the parties</u>.**  (*See Newman v. Sun Capital, Inc.*, No. 2:09-CV-445-FTM-29 (M.D. Fla.), Opinion and Order, 5/17/12 (D.I. No. 304), at 25 ("the Court concludes that the proposed Settlement Agreement is well within the range of fair, adequate, and reasonable recoveries.").)  A copy of the Opinion and Order is attached to the Appendix as Exhibit I (pp. A330-A371).

19.     Plaintiff repeatedly alleges in the Complaint that the principals of Sun Capital—Peter, Koslow, Leder, and their respective spouses—took advantage of their insider positions with the Companies to extract money and benefits through the Settlement Agreement to which they were not entitled.  (*See, e.g.*, Compl. ¶¶ 91, 100, 145, 150.)  On even cursory examination, these allegations are nonsensical.  As part of the Settlement Agreement, the Stable-Value Fund investors

became the new owners of the Companies.  As such, the consideration exchanged between the Principals and the Companies through the Settlement Agreement was not the Principals to approve or disapprove—that right belonged to the receiver and the Stable-Value Fund investors who assumed ownership of the Companies.  On top of that, none of the parties made any such claims at the time and Judge Steele affirmatively found that the principals of Sun Capital did not act improperly in any way.  As he held, "No one argues that there has been collusion between the parties, and the Court affirmatively finds a lack of collusion." *Newman v. Sun Capital, Inc.*, No. 2:09-CV-445-FTM-29 (M.D. Fla.), Amended Opinion and Order, 8/28/12 (D.I. No. 308), at 25 ("the Court concludes that the proposed Settlement Agreement is well within the range of fair, adequate, and reasonable recoveries.").)  A copy of the Amended Opinion and Order is attached to the Appendix as Exhibit J (pp. A330-A371).

20.     Moreover, the Settlement Agreement was nearly unanimously approved by the investors in Stable Value, each of whom were given the chance to "opt out" of the settlement and preserve their claims.  *S.E.C. v. Founding Partners Capital Mgmt.*, No. 2:09-CV-229-FTM-29, 2014 WL 2993780, at *16 (M.D. Fla. July 3, 2014).  As found by Judge Steele, over 99% of the investors opted to affirm and participate in the Settlement Agreement and receive equity interests in the entity that was later renamed PHG.  *Id.*  As such, Plaintiff's contention that the Stable Value investors, "in determining whether to opt-in to the Settlement Agreement, recognized the disproportionate perks for the Principals at the expense of the Companies under the Settlement Agreement" (Compl. ¶ 146) is wildly misleading at best.

21.     As noted above, prior to the collapse of Stable-Value Fund, Peter and Malinda owned 33.3.% of Success Healthcare, LLC, 28% of Promise Healthcare, Inc., and 60% of Sun Capital, Inc.  (Compl. ¶¶ 72-73.)  As part of the settlement, Peter and Malinda agreed to transfer

their significant equity positions in Sun Capital and the Companies to the Stable-Value Fund investors. (Settlement Agreement § 2.1(b).)  In exchange, the Stable-Value Investors, through the Companies they now owned, agreed to forgive approximately $1.3 million in debt owed by Peter or his affiliated entities and to pay him and Malida the comparatively modest amount of $882,600 each over the course of three years.  (Settlement Agreement Ex. L, Sched. 2.1(p) (App. 291, 329.)

22.     The truly lopsided bargain received by the Stable-Value Fund investors is shown by the parties' contemporaneous joint representation to Judge Steele that Promise was worth $115 million to $203 million.  *Newman v. Sun Capital, Inc.*, No. 2:09-CV-445-FTM-29 (M.D. Fla.), Joint Motion for Expedited Approval of Proposed Procedure to Obtain Court Approval of the Proposed Settlement Transaction, 12/9/11 (D.I. No. 248), at 22.), attached to the Appendix as Exhibit K (pp. A414-A519).  Thus, according to their own estimates at the time, and using the low end of their estimate of the value of Promise, Peter and Malinda agreed to sell their 33.3% interest in Promise, worth at least $20 million, for debt forgiveness of approximately $1.3 million and payments over time totaling $1,765,200.  The notion that Peter and Malinda received more than reasonably equivalent value for their shares is therefore ludicrous.

### D. At the Receiver's Urging, Peter Stayed on as CEO of the Companies and Lead Them to Remarkable Profitability Out of the Collapse of Stable-Value Fund.

23.     As to the Plaintiff's allegations that Peter extracted unfair compensation and payment from the Companies, contrary to the narrative Plaintiff is pushing, Sun Capital and the Companies needed Peter far more than he needed them.  Indeed, the receiver of Stable Value was unable to run Sun Capital, Promise, or Success on his own.  As he stated in open court, and as credited by Judge Steele, Stable-Value Funds's investors, the new owners of the companies, needed Peter to stay on as CEO to give the companies "a better chance of success."  *Newman v.*

10

*Sun Capital, Inc.*, No. 2:09-CV-445-FTM-29, 2012 WL 3715150, at *13 (M.D. Fla. Aug. 28, 2012) *(see* Appendix pp. A372-A413).

24.    Accordingly, by an Employment and Non-Competition Agreement (the "Employment Agreement") signed as part of the Settlement Agreement and attached to the Appendix as Exhibit L (pp. A520-A539), effective March 17, 2014, Peter agreed to continue working as CEO of the Companies for a period of at least two years, and to devote substantially all his time and services to the performance of his duties as CEO.   However, the Employment Agreement specifically carved out from this exclusivity requirement Peter's service on the boards of directors of certain entities provided such service did not interfere with his duties as CEO and was approved in writing by the Companies' board.  (Employment Agreement ¶ 3.)  In exchange, the Companies agreed to pay Peter a salary, certain performance-based incentive bonuses, and $360,000 per year for five years (referred to as the "Sun Capital Consultancy Payments" in the Employment and Non-Competition Agreement).   (Employment Agreement ¶ 4.)  Judge Steele specifically stated his belief that these terms were "market-rate compensation." *Newman v. Sun Capital, Inc.,* Case No. 2:09-CV-445-FTM-29 (M.D. Fla.), Opinion and Order, 5/17/12 (D.I. No. 304), at 18 (*see* Appendix Exhibit I at pp. A330-A371).

25.    Plaintiff, in either a remarkable failure of due diligence or an act of willful deception, contends that Malinda received approximately $520,000 in "alleged consulting payments" for which the Companies did not receive reasonably equivalent value. (Compl. ¶¶ 362-64.)  In fact, Malinda received these payments pursuant to an Income Deduction Order entered by the Florida state court in Peter and Malinda's divorce proceeding.  (*Baronoff v. Baronoff*, Case No. 502010DR013460XXXXSB, Circuit Court in and for Palm Beach County, Florida, Income Deduction Order, attached to the Appendix as Exhibit M (pp. A540-A542)).

26.     Following the reorganization, Baronoff served as the CEO of Promise and Success until March 13, 2018. (Compl. ¶ 339.)   During that time, the companies achieved demonstrable financial success considering the chaos from which they emerged.   In 2015, under Peter's stewardship, Promise earned an EBITDA of $22.4 million; in 2016, Promise earned an EBITDA of $21.0 million; and, in 2017, Promise earned an EBITDA of $200,000. (Compl. ¶ 252.) Similarly, in 2015, under Peter's stewardship, Success earned an EBITDA of $1.4 million; in 2016, Success earned an EBITDA of $3.9 million; and, in 2017, Success' EBITDA was negative $1.2 million. (Compl. ¶ 253.)

27.     Plaintiff makes a number of allegations about Peter's supposed negligence or malfeasance relating to the operations of the Companies following the Stable-Value Fund settlement.   In addition to being flatly belied by the successful results of the Companies that Plaintiff glosses over, the allegations themselves are flatly, incredibly false and incomplete.   The Baronoffs will prove this at the appropriate time.

### E.  Upon Peter's Resignation, the Companies Released Him and Agreed to Litigate Claims Relating to his Employment in the Southern District of Florida.

28.     Notwithstanding the remarkable results Peter achieved, by a Confidential Separation Agreement and Mutual General Release between Peter, Promise and Success (the "Separation Agreement," attached to the appendix as Exhibit N (pp. A543-A557)), ¶ 1.a), Peter agreed to resign as President and CEO of the Companies effective March 13, 2018.

29.     Peter and the Companies agreed that "any court action relating to this Separation Agreement shall be brought in a non-jury proceeding before the United States District Court for the Southern District of Florida."  (Separation Agreement ¶ 18 (Appendix at pp. A543-A557)).

30.     The Separation Agreement also contained a release by the Companies in favor of

Peter that covers "all causes of action, claims, demands, costs, payments, expenses, and damages which [the Companies] now ha[ve] based on any decision, event, act, or omission occurring from the beginning of time through the execution of this Separation Agreement." (Separation Agreement ¶ 3 (Appendix Exhibit N at pp. A543-A557)).

31.     If effective, this release will require judgment in favor of Peter on all of Plaintiff's claims. Plaintiff has contended that the release should be avoided as a fraudulent transfer (Count VIII) and seeks a declaration that it is null and void due to Peter's alleged breach of covenants in the Separation Agreement (Count XXIII).

**ARGUMENT**

I.     **VENUE SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF FLORIDA.**

32.     Except as otherwise provided, "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." 28 U.S.C. § 1409(a). In turn, 28 U.S.C. § 1412 provides that "a district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for convenience of the parties."

33.     "Courts in the Third Circuit generally examine twelve factors when determining whether transferring a case would be 'in the interest of justice or for the convenience of parties.'" *OCB Rest. Co., LLC v. Vlahkais (In re Buffets Holdings, Inc.)*, 397 B.R. 725, 727 (Bankr. D. Del 2008) (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d. Cir.1995)). These twelve factors are: (1) plaintiff's choice of forum, (2) defendant's forum preference, (3) whether the claim arose elsewhere, (4) location of books and records and/or the possibility of viewing the premises if applicable, (5) the convenience of the parties as indicated by their relative physical and financial condition, (6) the convenience of the witnesses—but only to the extent that the witnesses may

13

actually be unavailable for trial in one of the fora, (7) the enforceability of the judgment, (8) practical considerations that would make the trial easy, expeditious, or inexpensive, (9) the relative administrative difficulty in the two fora resulting from congestion of the courts' dockets, (10) the public policies of the fora, (11) the familiarity of the judge with the applicable state law, and (12) the local interest in deciding local controversies at home. *Jumara*, 55 F.3d at 879–80.   The first six factors are referred to as the "private interest" factors.  *Id.* at 879. The second six factors are referred to as the "public interest" factors. *Id.*

      **A.**    **The Private Interest Factors Weigh in Favor of Transfer to the Southern District of Florida.**

           **1.**    **There is an enforceable forum selection clause governing Plaintiff's claims against the Baronoffs and the Court should therefore deem the private interest factors to weigh entirely in favor of transfer.**

34.      "[W]here contracting parties have specified the forum in which they will litigate disputes arising from their contract, federal courts must honor the forum-selection clause '[i]n all but the most unusual cases.'" *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 397 (3d Cir. 2017)) (following the Supreme Court's instructions in *Atlantic Marine Construction Co. v. U.S. District Court*, 571 U.S. 49 (2013)).  "[A] forum selection clause is treated as a manifestation of the parties' preferences as to a convenient forum." *Jumara*, 55 F.3d at 880. The agreement to a forum selection clause therefore constitutes a waiver on behalf of the parties to challenge the preselected forum as inconvenient or less convenient for themselves, their witnesses, or their pursuit of the litigation. *Atlantic Marine*., 571 U.S. at 64.  As such, normally, where the parties have agreed to a forum selection clause, a court must deem the private-interest factors to weigh entirely in favor of the preselected forum, and the Court may only consider arguments about public-interest factors. *Id.*

35.     Here, Peter and the Companies—and, therefore, Plaintiff[3]—agreed to broad mutual general releases in the Separation Agreement.  (Separation Agreement ¶ 3 (Appendix Exhibit N at pp. A543-A557).)  The release in favor of Peter—which covers "all causes of action, claims, demands, costs, payments, expenses, and damages which [the Companies] now ha[ve] based on any decision, event, act, or omission occurring from the beginning of time through the execution of this Separation Agreement"—forecloses each and every claim brought by Plaintiff against Peter and his agents and assigns. Additionally, as at least a portion of the claims by Plaintiff against Malinda are derivative of his claims against Peter—Malinda received some of the payments in question as Peter's assignee pursuant to the Income Deduction Order entered in their divorce—she is also entitled to rely on the release.

36.     Critically for purposes of the transfer inquiry, Peter and the Companies also agreed in the Separation Agreement that "any court action relating to the Separation Agreement shall be brought in a non-jury proceeding in the United States District Court for the Southern District of Florida."  (Separation Agreement at ¶ 18 (Appendix Exhibit N at pp. A543-A557) .)  Determining the scope and the validity of the release is a threshold issue that any judge or jury must determine in adjudicating Plaintiff's claims against the Baronoffs.  Under the terms of the forum selection clause, that judge or jury must be seated in the Southern District of Florida.

---

[3] Plaintiff is asserting state law claims inherited from the Companies both as representative of the liquidated debtors and as trustee of the debtors' liquidating trust.  In his capacity as trustee, "the [T]rustee stands in the shoes of the debtor ... the [T]rustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir.1989) (quoting Collier on Bankruptcy, ¶ 323.02[4]). Therefore, the forum selection clause binds Plaintiff as trustee to the extent it would have bound the Companies had they brought this action.  *See In re LMI Legacy Holdings, Inc.*, 553 B.R. 235, 246 (Bankr. D. Del. 2016).

37.     The Court should enforce the forum selection clause.   A forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching,[4] (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable. *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983).   As to the first factor, Plaintiff has set forth no allegations that that forum selection clause was procured by fraud or overreaching, nor could he, given that it was negotiated between highly sophisticated companies and their most senior executive.   As to the third factor, inconvenience, Plaintiff must show that the Southern District of Florida is "so seriously inconvenient that it deprives [him] of [his] day in court." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 18 (1972).   Plaintiff will undoubtedly be able to pursue his claims in federal court in South Florida—and therefore will not be deprived of his day in court if the case is transferred there—so he cannot satisfy this factor either.

38.     This leaves the second factor—whether enforcement will violate a strong public policy of the forum.   Normally, there is strong public policy favoring centralization of bankruptcy proceedings in a bankruptcy court, and this policy may override a forum selection clause even where the proceedings concern core claims.   *Kurz v. EMAK Worldwide, Inc.*, 464 B.R. 635, 640 (D. Del. 2011) (citing *In re Exide Techn.*, 544 F.3d 196, 206 (3d Cir. 2008)).   The reason for this

---

[4] To the extent that Plaintiff attempts to make such an argument, Peter's filing of a proof of claim in the bankruptcy does not result in a waiver of his right to enforce the forum selection clause. "The Third Circuit has specifically held that a litigant can file a proof of claim in a bankruptcy case without waiving the provisions of a forum selection clause." *In re Access Care, Inc.*, 333 B.R. 706, 710 n. 5 (Bankr. E.D. Pa. 2005) (citing *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 204 (3d Cir. 1983)).

16

policy override is to concentrate core bankruptcy proceedings in the bankruptcy court to effectuate the Congressional purpose of facilitating the collection and distribution of bankruptcy estates. *In re Diaz Contracting, Inc.*, 817 F.2d 1047, 1051 (3d Cir. 1987).[5]

39.     Ultimately, however, "the most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate." *In re Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239, 1247 (5th Cir. 1979).  In other words, "[a]t best the grant of protective federal jurisdiction over proceedings related to title 11 is one circumstance to be taken into account" in making the public policy determination. *Coastal Steel*, 709 F.2d at 202.  *See, e.g.*, *In re OMNA Med.* Partners*, Inc.*, No. 00-1493 (MFW), 2000 WL 33712302, at *5 (Bankr. D. Del. June 12, 2000) (enforcing forum selection clause in permissively abstaining from considering core claims that were not central to the debtor's reorganization).

40.     Here, the public policy of effectuating the efficient collection and distribution of the bankruptcy estate is not implicated. The bankruptcy court has already confirmed the Second Amended Joint Plan of Liquidation.  *In re: Promise Healthcare Group, LLC, et al.*, Case No. 18-12491 (Bankr. D. Del.) [D.I. 2072].  All that is left is for Plaintiff to bring any remaining causes of action against potential sources of recovery for the debtors' estates.  That does not need to occur exclusively in this District to accommodate the orderly disposition of Plaintiff's various claims.

41.     Furthermore, rather than filing suit in the bankruptcy court, Plaintiff has brought its

---

[5] Plaintiff's principal claims—breach of duties of good faith and care, breach of fiduciary duty, breach of duty of loyalty, and liability for equity distributions and payments—are not even core proceedings.  They are state law claims that are at most only "related to" the bankruptcy cases such that the bankruptcy court itself would likely not have jurisdiction. *Shandler v. DLJ Merch. Banking, Inc. (In re Insilco Techs., Inc.)*, 330 B.R. 512 (Bankr. D. Del. 2005) (citing *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154 (3d Cir. 2004). Only Plaintiff's fraudulent transfer, preference and equitable subordination claims are core.

claims in this Court, which has no institutional knowledge of the case and no connection to the bankruptcy proceedings other than geographic proximity to the bankruptcy courthouse in which the order confirming the Second Amended Joint Plan of Liquidation was entered.  In other words, there is no reason that a district court in the Southern District of Florida would be less capable or efficient than this Court at adjudicating Plaintiff's claims and thereby benefitting the estates.  To the contrary, for the reasons discussed below, it would be cheaper and more efficient for the Plaintiff's claims to be prosecuted in South Florida.[6]

42.     For this reason, the line of cases suggesting that a bankruptcy court should rarely enforce a forum selection clause in the context of "core" claims, see, e.g., *In re Exide*, 544 F.3d at 206 ("Whether claims are considered core or non-core proceedings dictates not only the bankruptcy court's role and powers but also the availability of mandatory abstention and the enforcement of forum selection clauses"), is inapposite.  This is so because Plaintiff has chosen to bring this case in a District Court that may have plenary jurisdiction over all the claims yet no special familiarity with the facts of this matter.  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993) (noting that the justification for keeping core matters with the bankruptcy court is efficiency, "given that the bankruptcy court generally will be more familiar with the facts and issues").  Indeed, were the bankruptcy not filed, the Companies would necessarily have filed this

---

[6] Normally, there is an added complexity to the forum selection clause analysis where the remaining defendants are not subject to the clause.   Under these circumstances, when some defendants are subject to contractual forum selection clauses but others are not, the Third Circuit has prescribed a four-step inquiry considered in sequence: (1) the  forum-selection clauses, (2) the private and public interests relevant to non-contracting parties, (3) threshold issues related to severance, and (4) which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private interests.  *Howmedica*, 867 F.3d at 403–04.  Because all the defendants do not oppose the request to transfer venue, these considerations are not in play.

case in the Southern District of Florida. Accordingly, the forum selection clause should be enforced.

### 2. The private interest factors favor transfer even absent the forum selection clause in the Separation Agreement.

43.     Even absent the forum selection clause, the private interest factors still favor transfer. As to the first factor, plaintiff's choice of forum, "a forum selection clause is treated as a manifestation of the parties' preferences as to a convenient forum." *Jumara*, 55 F.3d at 880. "[W]hile courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen" a different venue. Id. Therefore, this factor favors transfer of venue.

44.     As to the second factor, defendants' forum preference, in addition to the forum selection clause evidencing the Baronoffs' predetermined choice of venue, the other nine defendants have either joined or do not oppose the request to transfer, which affords significant weight to this factor.

45.     The third factor, whether the claims arose elsewhere, also supports transfer to the Southern District of Florida. The Companies were at all times based and continue to be based in the Southern District of Florida. All the allegedly fraudulent transfers from the Companies took place in the Southern District of Florida where they were headquartered. Similarly, all actions and omissions by the directors and officers of the Companies either took place or caused harm to the Companies in the Southern District of Florida. The relevant agreements, including the Separation Agreement with its dispositive release, were negotiated and executed by the Companies in the Southern District of Florida. iCare is located in South Florida and the Companies' transaction with iCare occurred there. And the leased premises that are the basis of the claim against Shanna

is in the Southern District of Florida.

46.     The location of the books and records relevant to the claims, the fourth factor, leans toward transfer, as the Companies and all of their records are based in the Southern District of Florida, as are Leder, Koslow, and the receiver of Stable Value, Dan Newman, who are likely to possess a significant number of responsive documents both as to the settlement that gave birth to PHG and as to the underlying health of the Companies at the time PHG was created.

47.     As to the convenience of the parties, it would be inequitable to force Malinda, who has significant health problems, and her daughter Shanna, who is in her early 30s, to bear the financial burden and strain of defending themselves against a suit brought in Delaware for acts that they allegedly performed exclusively in South Florida where they lived at all relevant times and continue to live to date.   Similarly, four of the other defendants—Armstrong, Gold, Grabish, and Cohen—live in the Southern District of Florida.   No one lives in the District of Delaware except some of the lawyers for Plaintiff and Defendants. This factor therefore weights in favor of transfer to the Southern District of Florida.

48.     As to the sixth factor, to the Baronoffs' knowledge, there is not a single material witness who lives in Delaware or could be compelled to attend trial through a subpoena.  To the contrary, in addition to the defendants who live in South Florida, the numerous management employees who have not been sued but who are material witnesses were based in South Florida as of the fall of 2018 when the Companies filed their bankruptcy petitions and therefore are likely based there today.  So, too, is the receiver, Mr. Newman, perhaps the most critical witness with respect to the events leading to the formation of PHG.   Also significant is the presence of Leder, Koslow, and the Companies' audit team, Ernst & Young, in Florida.

20

**B.** **The Public Interest Factors Also Weigh in Favor of Transfer.**

49.     There is no question that a judgment entered by a court in the Southern District of Florida is as enforceable as one entered by this Court.  Given that many of the defendants live in Florida, siting the case in Florida would actually make collection of any judgments entered easier if the judgments were entered there.  The seventh Jumara factor weighs in favor of transfer.

50.     Practically, trial would be easier, more expeditious, and inexpensive if it were located where the witnesses, documents, and majority of parties are located, South Florida.  The eighth factor therefore also weighs in favor of transfer.

51.     As it pertains to the ninth factor, relative administrative difficulty in the two fora resulting from congestion of the courts' dockets, as of September 2020, the median time from filing to disposition and filing to trial of civil cases in the District of Delaware was 6.4 and 28.4 months.  *See* U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (September 30, 2020), available at https://www.uscourts.gov/file/28867/download.  (A copy is attached to the Appendix as Exhibit O (pp. A558-A653)).  In contrast, the median time from filing to disposition and filing to trial of civil cases in the Southern District of Florida was 3.4 and 15.8 months.  (*Compare* A572 *with* A650) . In other words, on average, cases are resolved nearly twice as fast in the Southern District of Florida compared to the District of Delaware, which favors transfer to ensure the speedy disposition of Plaintiff's claims on behalf of the estates.

52.     With respect to the public policies of the fora, the tenth factor, Florida has a clear interest in enforcing its corporate law and deciding claims involving Florida corporation brought against Florida citizens.  Although Delaware has an interest in ensuring the orderly disposition of claims seeking to collect funds for the benefit of creditors of the debtors' estates, there is no reason that transferring this case to the Southern District of Florida would impede that policy.  At best,

21

this factor is neutral.

53.    As to the eleventh and twelfth factors, a court in the Southern District of Florida is more likely than this Court to be familiar with the Florida Business Corporation Act, the Florida law governing fiduciary duties of officers and directors of Florida entities based in Florida, and Florida's fraudulent transfer statute, which are dispositive of the majority of the claims brought by Plaintiff. And, because this is truly a local controversy involving Florida companies, with at least half the defendants as Florida residents, concerning alleged acts and omissions that took place in Florida, Florida has a greater interest than Delaware in having the case decided there.

54.    In sum, as nearly every one of the *Jumara* factors favors transfer, the Court should do so here.

## II. ALTERNATIVELY, THE COURT SHOULD DISMISS COUNTS XII AND XV (MALINDA FRAUDULENT TRANSFER CLAIMS) AND COUNT V (BREACH OF CONTRACT CLAIM).

### A. Counts XII and XV Should Be Dismissed on Collateral Estoppel Grounds.

55.    In Counts XII and XV, Plaintiff brings claims to avoid allegedly fraudulent transfers from the Companies to Malinda. More specifically, in Count XII, Plaintiff alleges that the payments to Malinda representing her one-half interest of Peter's Sun Capital Consultancy Payments were fraudulent transfers made for "less than reasonably equivalent value." (Compl. ¶ 490.) In Count XV, Plaintiff alleges that the payments to Malinda for her shares in the Companies were fraudulent transfers made for "less than reasonably equivalent value." (Compl. ¶ 512.)

56.    Plaintiff's claims in Counts XII and XV fail as a matter of law as Judge Steele already determined that the exchange between the Stable-Value Fund investors, the Companies, and Peter and Malinda—including the payment for her shares in the Companies and Peter's compensation of which the Sun Capital Consultancy Payments were a part—was "fair, adequate,

and reasonable." *Newman v. Sun Capital, Inc.*, Case No. 2:09-CV-445-FTM-29 (M.D. Fla.), Opinion and Order, 5/17/12 (D.I. No. 304), at 25) (Appendix Ex, I at (pp. A330-A371)). *See also id.* at 18 (Peter's various compensations under the Employment Agreement "are believed to be market-rate compensation.").

57.     The Trustee is bound by these findings under the doctrine of collateral estoppel. Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L.Ed.2d 210 (1979) (citations omitted).  "The theory underlying the doctrine of collateral estoppel, as well as res judicata, is that, as between the parties and their privies, an issue need and should be judicially determined only once." *Matter of McMillan*, 579 F.2d 289, 292 (3d Cir. 1978).  The following four elements are required for the doctrine to apply: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Szehinskyj v. Attorney Gen. of the United States*, 432 F.3d 253, 255 (3d Cir. 2005) (citation omitted).

58.     Here, Judge Steele previously decided the issue of whether the bargained for exchange that resulted in the payments to Malinda was fair, adequate, and reasonable, which is the same inquiry that the Court must make on the "reasonably equivalent value." *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) ("a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave'").  This issue was actually litigated before Judge Steele in the receiver's case against Sun Capital and was necessary to his determination that the transaction was fair, adequate, and reasonable.  *Newman v. Sun Capital,*

*Inc., et al.*, Case No. 2:09-CV-445-FTM-29 (M.D. Fla.), Opinion and Order, 5/17/12 (D.I. No. 304), at 22 (Appendix Exhibit I at (pp. A330-A371) ("the Court applies the standard developed in class action cases for review of the proposed settlement agreement. A district court reviews a class action settlement for fairness, reasonableness, adequacy, and the lack of collusion between the parties," among other things).  Finally, Plaintiff, who has asserted numerous claims on behalf of the Companies as the liquidating trustee, was fully represented by the stakeholders in the litigation before Judge Steele who were highly motivated, as the new owners, to ensure that they did not overpay for Peter or Malinda's shares or Peter's compensation to continue running the Companies.

59.     As the issue of reasonably equivalent value for the payments in question to Malinda has already been conclusively decided against Plaintiff, Counts XII and XV should be dismissed with prejudice.

**B.  <u>Count V Should Be Dismissed for Failure to State a Claim.</u>**

60.     In Count V, Plaintiff alleges that Peter breached the Exclusive Services Provision of his Employment Agreement with the Companies by serving as a board member of iCare. (Compl. ¶ 440.)  According to Plaintiff, Peter's role as a board member of iCare materially interfered with his employment obligations under the Employment Agreement, as he allegedly used his role as President and CEO of the Companies to make an unsuccessful investment of $4.5 million in iCare. (Compl. ¶ 440.)

61.     This claim fails as a matter of law for two reasons.  First, Plaintiff admits that the Companies were "development partners" with iCare and were entitled to share in its profits. (Compl. ¶ 313.)  In other words, iCare was an investment of the Companies.  As such, Peter's role as a board member of iCare was plainly within the performance of his duties and obligations as President or CEO.  As such, not only did his role as a board member of iCare not materially

24

interfere with his employment obligation, his role as a board member of iCare **was his actual employment obligation**.

62.     Second, even if Peter's service as an iCare board member was a restricted outside business activity, which it was not, the Exclusive Services Provision does not apply if such outside business activity was approved in advance by the Companies in writing. Here, Plaintiff admits that Peter's service as a board member was approved in advance by the Companies.  (Compl. ¶¶ 323-24.)  For these reasons, Count V should be dismissed with prejudice.

## III.   CONCLUSION

63.     Plaintiff's trumped up Complaint belongs in the Southern District of Florida where all material events occurred, where the majority of material witnesses are located, and where the Companies and Peter agreed the dispute would be resolved.  In the event the Court denies the Baronoffs' request to transfer, the Court should still dismiss Counts V, XII, and XV, which fail as a matter of law.

WHEREFORE the Baronoffs move the Court to transfer this case to the Southern District of Florida, or, in the alternative to dismiss Counts V, XII, and XV, to extend the deadline for them to answer and assert any counterclaims to the Complaint until this motion is decided,  and to grant such other relief that the Court deems just and proper.

SULLIVAN HAZELTINE ALLINSON LLC

 */s/ William A. Hazeltine*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 N. Market St., Suite 420
Wilmington, Delaware  19801
Tel: 302-428-8191
Fax: 302-428-8195
Email:  bsullivan@sha-llc.com
          whazeltine@sha-llc.com

25

and

Benjamin H. Brodsky, Esq., FBN 73748
Corey D. Berkin, Esq., FBN 119069
(*pro hac vice* applications pending)
BRODSKY FOTIU-WOJTOWICZ, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: 305-503-5054
Fax: 786-749-7644
bbrodsky@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

Date:  February 19, 2021          *Counsel for the Baronoff Defendants*

26

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT MICHAELSON OF ADVISORY
TRUST GROUP, LLC, IN HIS CAPACITY
AS DEBTOR REPRESENTATIVE AND
LIQUIDATING TRUSTEE,

     Plaintiff,

                                   Case No. 1:20-cv-01465-MN

v.

PETER BARONOFF, KEITH REUBEN,
BRIAN DUNN, DAVID ARMSTRONG,
JAMES HOPWOOD, RICHARD GOLD,
BRYAN DAY, STAN GRABISH, RICHARD
COHEN, STEVEN HELLAND, MALINDA
BARONOFF, SHANNA BARONOFF, and
JOHN DOES 1-100,

     Defendants.

_____/

### <u>DECLARATION OF PETER BARONOFF</u>

     1.     My name is Peter Baronoff. I am over 21 years of age, I make this declaration

on personal knowledge, and I am otherwise competent to testify.

     2.     Promise Healthcare, Inc. ("Promise") and Success Healthcare, LLC

("Success") (collectively, the "Companies"), at all material times, were South Florida-based

entities.

     3.     Promise is a Florida corporation with its principal place of business in Palm

Beach County, Florida.

     4.     Success is a California limited liability company with its principal place of

business in Palm Beach County, Florida.

5.      At all times material, the Companies had their offices and employees in South Florida, conducted their daily business operations in South Florida, and held board meetings in South Florida.

6.      Sun Capital, Inc. and Sun Capital Healthcare, Inc. (collectively, "Sun Capital"), prior to their dissolution in 2015, were both Florida corporations with their principal place of business in Palm Beach County, Florida.

7.      Sun Capital had their offices and employed their employees in South Florida, conducted their daily business operations in South Florida, and held board meetings in South Florida.

8.      Founding Partners Stable-Value Fund, LP ("Stable-Value Fund") is a Delaware limited partnership with its principal place of business in South Florida.

9.      Stable-Value Fund's general partner, Founding Partners Capital Management Company, is a Florida corporation with its principal place of business in South Florida.

10.     The business transactions between Stable-Value Fund, Sun Capital, and the Companies all occurred in South Florida.

11.     My former wife, Malinda Baronoff, and my daughter, Shanna Baronoff, both reside in South Florida. Both are co-defendants in this litigation.

12.     Malinda Baronoff has significant health problems, which makes traveling to Delaware for any court proceedings practically impossible.

13.     I have lived in Florida at nearly all times material to this litigation. I have never lived in Delaware.

14.     Howard Koslow and Lawrence Leder, key non-party witnesses that allegedly received millions of dollars of fraudulent transfers that Plaintiff claims were improperly

approved by Defendants, reside in South Florida.

15.    Daniel Newman, the longtime trustee of Stable-Value Fund, is a practicing lawyer in South Florida. Mr. Newman is a central witness as to the events leading to the creation of Promise Healthcare Group, LLC ("PHG").

16.    The settlement of the Stable-Value Fund receiver's action that gave rise to PHG was negotiated and signed in South Florida.

17.    Crowe Horwath LLP's audit team for the Companies was based in Florida.

18.    John Siedlecki, the responsible partner at FTI Consulting, Inc., which was hired by PHG, has a home in South Florida.

19.    iCare.com, Inc., ("iCare") the electronic health records company in which the Companies invested, has at all material times been based in South Florida.

20.    The iCare transaction was negotiated and consummated in South Florida.

21.    Aleyda Yanes, the Companies' controller, who will give key testimony on the Companies' accounting and financial information, lives in South Florida.

22.    Maureen Moore, the Companies' former director of clinical operations, who will testify about the Companies' operations during my tenure, lives in South Florida.

23.    Dr. Chuck Posternack, Promise's Chief Medical Officer, COO, and President during 2017 and 2018, lives in South Florida.

24.    The board decisions alleged in the Complaint took place in South Florida. Similarly, the communications by and among officers, directors, and employees of the Companies, occurred in South Florida.

25.    The lease between Shanna Baronoff and the Companies was signed in South Florida for a condominium unit in South Florida.

26.     My Separation Agreement and Mutual General Release was negotiated and executed in South Florida and contains a mandatory forum selection clause siting venue in the Southern District of Florida.

27.     The lawyers who negotiated these agreements—Sarah Gold, Howard Weiss, and Henry Handler—are all located in South Florida.


I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 16, 2021


PETER BARONOFF